**BRYSON HARRIS SUCIU
& DEMAY PLLC**
Trenton R. Kashima (SBN 291405)
19800 MacArthur Blvd., STE 270
Irving, CA 92612
Tel: 619-810-7047
tkashima@brysonpllc.com

*Counsel for Plaintiffs*

*[Additional Counsel Listed On Signature Page]*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK GLINOGA, on Behalf of Himself and All Others Similarly Situated, | Case No.: _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| SULLIVAN ENTERTAINMENT INC. d/b/a GAZEBOTV, SULLIVAN HOME ENTERTAINMENT LIMITED, SULLIVAN ENTERTAINMENT INTERNATIONAL INC., and SULLIVAN ENTERTAINMENT GROUP INC., | |
| Defendants. | |

Plaintiff Mark Glinoga ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendants Sullivan Entertainment Inc., Sullivan Home Entertainment Limited, Sullivan Entertainment International Inc., and Sullivan Entertainment Group Inc. (collectively, "Sullivan Entertainment") d/b/a GazeboTV ("GazeboTV" or "Defendants"). GazeboTV owns and manages a video streaming website at https://www.gazebotv.com/browse (the "Website").

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons who subscribed to Defendants' Website and subsequently requested, accessed, or watched pre recorded video content through the Website. Congress enacted the Video Privacy Protection Act (the "VPPA") to prohibit disclosures that identify a person as having requested or obtained specific video materials, recognizing that the resulting privacy injury occurs at the moment of disclosure.

2.      The Website is engaged in the sale and delivery of pre recorded audio visual materials. It offers users the option to subscribe by providing an email address, which allows users to buy, rent, or download digital movies and television series (the "Subscribers").[1]

3.      A subscription unlocks access to the Website's library of digital movies and television series, including exclusive behind-the-scenes content, documentaries, and interviews. Through this subscription relationship, Defendants collect information that directly links identified Subscribers to the specific video materials they request and view.

4.      The Website provides access to and delivers pre recorded video content to Subscribers. Defendants market the Website as a platform for accessing and viewing pre recorded video content, and operate the Website to deliver that content to Subscribers.

5.      To operate the Website and stream video content to Subscribers, Defendants chose to work with Vimeo, Inc. to host the Website and provide the underlying streaming technology.

---

[1]      *How GazeboTV Works*, GAZEBOTV, https://home.gazebotv.com/#:~:text=Browse%20Our%20Library%20%2D%20Explore%20our%20collection%20of%20digital%20movies%20and%20TV%20series (last visited Dec. 17, 2025); *GazeboTV Account*, GAZEBOTV, https://www.gazebotv.com/checkout/subscribe/signup (last visited Dec. 17, 2025).

Defendants made use of Vimeo's "over the top" ("OTT") platform," which allows video content providers, like Defendants, to "[send] videos straight to users who want them, without the go-between of using broadcast or cable platforms.."[2]

***Video Privacy Violations***

6.     Defendants implemented Tracking Tools on every webpage that hosts video content, and those tools record users' video viewing activity.

7.     Defendants do not disclose that Subscribers' Sensitive Information, including personally identifiable information ("PII"),[3] would be captured by the Tracking Tools, and then transmitted to third parties.

8.     The Website does not inform Subscribers that their Sensitive Information would be exposed, available, and readily usable by any person of ordinary technical skill who receives that data.

9.     At no point during or after the subscription sign up process – or anywhere on the Website for that matter – do Defendants seek or obtain consent for the disclosure of Subscribers' Sensitive Information, which Defendants surreptitiously gathered through the use of the Tracking Tools that it chose to employ on the Website.

10.     When deciding whether to subscribe, consumers consider (i) how a service collects personal information and (ii) how that information is shared.

11.     Congress recognized that the disclosure of personally identifiable information in connection with video viewing information results in immediate harm.

12.     Congress' enactment of the VPPA, and its continued endorsement of the statute, supports that recognition.  The VPPA prohibits video tape service providers,[4] such as Defendants,

---

[2] *Create an OTT platform,* VIMEO, https://vimeo.com/ott (last visited Dec. 17, 2025).
[3] 18 U.S.C. § 2710(a)(3) ("includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").
[4] 18 U.S.C. § 2710(a)(4).

CLASS ACTION COMPLAINT

from sharing Subscribers' PII, including the title, description, or subject matter of pre-recorded audio video material[5] requested by Subscribers, without valid consent.[6]

13.    Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a consumer's information is shared.

14.    Defendants purposefully implemented and utilized Meta, Inc.'s ("Facebook" or "Meta") tracking pixel (the "Pixel," discussed and defined herein) to track Subscribers' activity on the Website and disclose that information, including Subscribers' PII, to Facebook to gather valuable marketing data. The Pixel could not be placed on the Website without steps taken directly by or on behalf of Defendants.

15.    GazeboTV configured the Website to include and use the Pixel on webpages containing video content; that configuration results in the sharing of a Subscriber's personally identifiable information when video materials are requested.[7]

16.    Defendants do not seek and have not obtained consent from Subscribers to utilize the Pixel to track, share, and exchange their Sensitive Information, including their PII, with Facebook.

17.    Subscribers of the Website suffered harm as a result of Defendants' violations of the VPPA.   In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Website, or (ii) add adequate notices and obtain the appropriate consent from Subscribers.[8]

---

[5] 18 U.S.C. § 2710(b)(2)(D)(II).

[6] 18 U.S.C. § 2710.

[7] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having *requested* or obtained" video materials.  *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user.  *See How the web works*, Mozilla, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works   (last visited Dec. 17, 2025).

[8] Website owners like GazeboTV also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook.  *See Advanced Matching*, Facebook,        https://developers.facebook.com/docs/meta-pixel/advanced/advanced-

CLASS ACTION COMPLAINT

***Wiretap Violations***

18.    Federal and state legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

19.    Congress passed the Federal Wiretap Act, which prohibits the unauthorized interception of electronic communications.

20.    California passed the California Invasion of Privacy Act ("CIPA"), which attaches liability to any person who, willfully and without the consent of all parties to a communication, attempts to read or to learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California. [9]

21.    CIPA also prohibits the installation of a "pen register or a trap and trace device without first obtaining a court order . . . ." [10]

22.    Defendants purposefully implemented and utilized the Pixel and other Tracking Tools to intercept and read Subscribers' search terms and disclose the location and content of webpages visited by Subscribers. The Website does not provide notice of or obtain consent as to such practices.

23.    Subscribers of the Website, such as Plaintiff, have an interest in maintaining control over their Sensitive Information, as well as an interest in preventing their misuse.

24.    Subscribers of the Website have been harmed by Defendants, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Tracking Tools from the Website, or (ii) add, and obtain, appropriate consent from Subscribers.

---

matching#security (last visited   Dec. 17, 2025); *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools (last visited Dec. 17, 2025) ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission.").
[9] Cal. Penal Code § 631(a).
[10] Cal. Penal Code § 638.51.

25.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of Subscribers of the Website for violations of the VPPA, 18 U.S.C. § 2710; violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); and violations of CIPA, Cal. Penal Code § 631 & 638.

## **PARTIES**

26.     Plaintiff Mark Glinoga is, and has been at all relevant times, a citizen of California who resides in Los Angeles, California. Plaintiff Glinoga used Defendants' Website to access video content, especially historical content. By interacting with Defendants' Website, Plaintiff Glinoga's Sensitive Information was disclosed to third parties, including Meta, through Defendants' placement of Tracking Tools, including the Pixel, on the webpages he visited on Defendants' Website. These webpages include but are not limited to the webpages for the search engine, the specific videos he watched, and the webpage through which Plaintiff Glinoga subscribed to the Website. The Sensitive Information disclosed to third parties included but is not limited to Plaintiff Glinoga's search terms, the titles or descriptions of videos he watched, and his unique Facebook ID. Plaintiff Glinoga had an active Facebook account at the time of his interactions with Defendants' Website. Shortly after visiting the Website to view video content, Plaintiff Glinoga began to receive unsolicited advertisements relating to the videos he watched. Plaintiff Glinoga saw nothing on the Website that suggested to him that his Sensitive Information would be disclosed to unauthorized third parties and did not authorize, consent to, or otherwise engage or permit the disclosure of his Sensitive Information to Meta or any third party. Plaintiff Glinoga would not have used the Website to access video content had he known that his Sensitive Information would be disclosed to unauthorized third parties.

27.     Defendant Sullivan Entertainment, Inc. d/b/a GazeboTV, having its registered address at 110 Davenport Road, Toronto, Ontario M5R 3R3 Canada, has been in the business of

writing, producing, and directing films and television series for over thirty years.[11] GazeboTV is the home for classic movies and series from Sullivan Entertainment, including the original Anne of Green Gables and spin-off Road to Avonlea,[12] that focuses on digital content and direct-to-consumer services. Defendants own and operate GazeboTV, which offers service to buy or rent live and on-demand digital movies and TV series, including a collection of DVDs & Blu-ray Collections.

28.    Defendant Sullivan Home Entertainment Limited is a Canadian-registered entity with its registered agent located at 110 Davenport Road, Toronto, Ontario, M5R 3R3, Canada.

29.    Defendant Sullivan Entertainment International Inc. is a Canadian-registered entity with its registered agent located at 110 Davenport Road, Toronto, Ontario, M5R 3R3, Canada.

30.    Defendant Sullivan Entertainment Group Inc. is a Canadian-registered entity with its registered agent located at 110 Davenport Road, Toronto, Ontario, M5R 3R3, Canada.

## JURISDICTION AND VENUE

31.    The District Court for the Central District of California has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Video Privacy Protection Act, 18 U.S.C. § 2710, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

32.    This Court has personal jurisdiction over Defendants because Defendants derive revenue in the State of California, including Defendants' revenue generated from its management over the Website, including the revenue sharing, advertising sales, etc. that Defendants derive from the Website.

---

[11] *About*, SULLIVAN ENTERTAINMENT, https://www.sullivanmovies.com/ (last visited Dec. 17, 2025).
[12] *How GazeboTV Works,* GAZEBOTV, https://home.gazebotv.com/ (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

33.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business operations in this District. In connection with the Website, the video content, and the hosting of media accessible to Subscribers, all claims originate and arise out of Defendants' business operations in this District. Lastly, venue is proper in this District because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## COMMON FACTUAL ALLEGATIONS

### I. Legislative Background

### A. The Video Privacy Protection Act

34.     The events leading to the enactment of the VPPA arose in 1988, when a newspaper published the video rental history of Supreme Court nominee Judge Robert H. Bork's family. During subsequent floor debate, members of Congress stated that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we have to guard against.

S. Rep. 100-599, at 5-6.

35.     Congress recognized that "information pools" created privacy interests that impacted individual expression, association, and the exercise of constitutional freedoms. *Id.* at 7.

36.     Senator Patrick Leahy and the late Senator Paul Simon observed that records of this nature offer: "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

37.     Senator Simon complained that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6-7.

38.    Senate Bill 2361 was then drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

39.    The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

40.    The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions." *Id.* at 8.

41.    In 2012, Congress amended the VPPA. In so doing, Congress reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

42.    During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[13]

43.    Multiple courts have applied the VPPA to online video services, including websites that stream prerecorded content.[14]

---

[13] *See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited Dec. 17, 2025).

[14] *See, e.g., Sellers v. Bleacher Report, Inc.,* 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL,* 2022 U.S. Dist. LEXIS 163706, at *11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

44.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

45.    The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

46.    Congress designed the VPPA to protect transactions in which a consumer requests or obtains specific video materials or video services from a VTSP. The statute covers such transactions whether they occur digitally or in physical form.

47.    A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

48.    Courts have interpreted the VPPA's definition of a video tape service provider broadly. A provider need not deal exclusively in audio visual content; it suffices that such content forms part of the provider's business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

49.    Consumer is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). The broad language defining consumer comports with the initial purpose of the VPPA.

50.    In interpreting the VPPA, a 'consumer' includes a renter, purchaser, or subscriber of any of a provider's 'goods or services,' whether audiovisual or not. *Salazar*, 118 F.4th at 548-49.

51.    Defendants deliver and provide pre recorded audio visual materials to Plaintiff and Class Members through the Website.

52.    Plaintiff and Defendants maintained a consumer relationship involving the request for and delivery of pre recorded video content.

53.     Defendants disclosed Plaintiff's personally identifiable information to Facebook in a knowing and systematic manner, without obtaining Plaintiff's consent.

**B. The Federal Wiretap Act**

54.     The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[15]

55.     The Wiretap Act initially focused on government wiretapping, but Congress became concerned that technological developments such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" had outpaced the statute.[16] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[17]

56.     The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[18]

57.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person "intentionally intercepts . . . or procures any person to intercept . . . any . . . electronic communication" (2511(1)(a)), "intentionally discloses . . . To any other person the contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection" (2511(1)(c)), or "intentionally uses . . . The contents of any . . . Electronic communication, knowing or having reason to know that thei nformation was obtained through the interception of a . . . Electronic communication in violation of this subsection (2511(1)(d))..

---

[15] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[16] Senate Rep. No. 99-541, at 2 (1986).
[17] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[18] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

CLASS ACTION COMPLAINT

58.     The Wiretap Act initially concerned the government's use of wiretaps, but Congress became concerned that technological advancements such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the statute out of date. 18 U.S.C. §2511(2)(d).

59.     While communicating with Defendants on the Website through their viewing choices, Subscribers had the contents[19] of their communications with Defendants intercepted by third parties via the Tracking Tools.

60.     Defendants purposefully included the Tracking Tools on the Website to intercept Plaintiff's communications and redirect them to third parties to improve the effectiveness of its advertising and marketing.

61.     Plaintiff did not know of, or consent to, the exposure of his legally protected communications with Defendants to third parties.

**C. The California Invasion of Privacy Act**

62.     CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[20] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[21]

63.     CIPA serves as California's counterpart to the Federal Wiretap Act; each statute addresses similar elements and targets similar privacy harms.

64.     To protect people's privacy, legislators broadly protected communications being sent to or received from California.[22]   Notably, California set out to prohibit (i) intentional

---

[19] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and, 3) the PII discussed in Section III(A).
[20] Cal. Penal Code § 630.
[21] *Id.*
[22] Cal. Penal Code § 631-32.

CLASS ACTION COMPLAINT

wiretapping or (ii) willful attempts to learn the contents of communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[23]

65.     CIPA also prohibits the installation of a "pen register" or a "trap and trace device" without first obtaining a court order.[24]

66.     "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[25]

67.     "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[26]

68.     Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

69.     Defendant was not authorized by any court order to use Tracking Tools, including the TikTok Pixel, to record and capture Plaintiff's and Class Members' communications with the Website in violation of CIPA § 638.

**II. Defendants Control The Website**

**A. GazeboTV Owns and Manages the Website**

70.     GazeboTV maintained control over the Website.

---

[23] *Mastel v.Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[24] Cal. Penal Code § 638.51.
[25] *Id.* § 638.50(b).
[26] *Id.* § 638.50(c).

71.     While Vimeo provided the underlying technology for the Website and video streaming services, GazeboTV controlled the relevant portions of the Website. GazeboTV's ownership and control appear in its Privacy Policy: "This is the Privacy Policy of GazeboTV (hereafter referred to as "us" or "we"). This Privacy Policy describes how your personal information is collected, used, and shared when you use our streaming service, GazeboTV through our website (www.gazebotv.com) or any of our branded apps (together, the "Service")."[27]

72.     GazeboTV's management and control extend beyond those functions.   The Privacy Policy also states: "For more information about our privacy practices, if you have questions, or if you would like to make a complaint, please contact us by using our form or by mail using the details provided below: Sullivan Entertainment (d/b/a GazeboTV) 110 Davenport Road Toronto, Ontario M5R 3R3 Canada."[28]

**B. GazeboTV Manages the Relevant Portions of the Website**

73.     OTT website owners have control over and choose which videos to upload and make available to their Subscribers.[29]

74.     OTT website owners also have control over how subscriptions work, including which videos are unlocked by subscriptions and become deliverable to Subscribers.[30]

---

[27] *Privacy Policy*, GAZEBOTV, https://www.gazebotv.com/privacy#:~:text=This%20is%20the,the%20%E2%80%9CService%E2%80%9D  (last visited Dec. 17, 2025).
[28] *Id.*
[29] *See Uploading videos on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426966892561-Uploading-videos-on-Vimeo-OTT (last visited Dec. 17, 2025).
[30] *See Creating and Editing a Subscription*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427127095441-Creating-and-editing-a-subscription-product-on-Vimeo-OTT   (last visited Dec. 17, 2025).

75.    Vimeo provides instructions to OTT website owners, including Defendants, on how to add metadata to its video content and webpages so users can more easily discover and web-search for video content hosted on the OTT website.[31]

76.    Vimeo recommends, for example, naming videos to improve search engine optimization.[32]

77.    Vimeo establishes that when a video is added to an OTT website by its owner or operator, the video is named after the digital file uploaded by default.[33]

78.    The responsibility for providing clear video titles rests with the OTT website owner; those titles are used "to form the URL where the video lives."[34]

79.    OTT website owners are given an additional opportunity to "rename a video or collection . . . URL [to] something relevant . . . ."[35]

80.    OTT website owners must take affirmative steps to add detailed URLs to their OTT websites.

81.    GazeboTV undertook these steps and added detailed URLs to the Website.

82.    Vimeo gives OTT website owners the ability to add metadata to their videos "so that [their] customers can easily discover related content they might enjoy. It also allows [OTT website owners] to make it easier for viewers to find [OTT website owners'] content via search or other parameters."[36]

---

[31]    *See Add metadata to my Vimeo OTT videos for discovery*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427018284945-Add-metadata-to-your-Vimeo-OTT-videos-for-discovery (last visited Dec. 17, 2025).

[32]    *See Optimize your Vimeo OTT site for search engines (SEO)*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426994162961-Optimize-your-Vimeo-OTT-site-for-search-engines-SEO (last visited Dec. 17, 2025).

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

[36]    *Add metadata to my Vimeo OTT videos for discovery*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427018284945-Add-metadata-to-your-Vimeo-OTT-videos-for-discovery    (last visited Dec. 17, 2025).

83.     The metadata added to videos by OTT website owners can include information about the video, like content tags that "describes the specific video"; genres; cast; crew; release date; ratings; advisories, if the video contains offending content; and advanced or custom metadata created by the OTT website owners.

84.     OTT website owners must take affirmative steps to add metadata to their OTT websites.

85.     GazeboTV undertook these steps and added metadata to the Website.

86.     Vimeo informs OTT website owners that provide content on Vimeo's OTT platforms that Vimeo merely provides support for OTT website owners "adding conversion tracking Pixels from services like Facebook, X (formerly Twitter), or Adwords . . ."[37]

87.     Vimeo explains that "[a] pixel tracks certain events (like when someone makes a purchase through your site, etc.); when the events you're tracking are triggered, the pixel sends the data over to your analytics."[38]

88.     Vimeo states that after an OTT website owner installs a tracking pixel on its OTT website, the intercepted data becomes viewable through the website owner's account on the pixel's platform.[39]

89.     Vimeo provides instructions to OTT website owners, including GazeboTV, on how to add the Pixel to their OTT websites. OTT website owners decide whether to add tracking tools, including the Pixel, to Vimeo associated websites.

90.     To add the Pixel, an OTT website owner must first create a Pixel on Facebook's platform and then add the Pixel ID to Vimeo's tracking integration.[40] *Then*, the OTT website

---

[37] *Add tracking pixels to your Vimeo OTT checkout page*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427502043409-Add-tracking-pixels-to-your-Vimeo-OTT-checkout-page (last visited Dec. 17, 2025).
[38] *Id.*
[39] *Id.*
[40] *Id.*

CLASS ACTION COMPLAINT

owner must attach the tracking pixel to their Associated Product in their OTT website (or otherwise select "All Products").[41] *Finally*, the OTT website owner must save these settings.

91.    Vimeo advises OTT website owners that the Pixel tracks the following events by default: PageView, InitiateCheckout, Purchase, and Complete Registration.[42]

92.    GazeboTV undertook the steps necessary to add the Pixel to their Website. GazeboTV also made use of the Pixel SubscribedButtonClick event. GazeboTV did not accept the default events. Instead, GazeboTV programmed the Pixel to collect additional information when subscribers click specific buttons, such as to request videos. *See* Section III(A).

93.    GazeboTV controlled its Privacy Policy and cookie notifications on the Website.

94.    While Vimeo provides a "simple cookie consent banner" for OTT websites, Vimeo informs OTT website owners that "[c]ertain sites may be subject to further regulations depending on their purpose, content, and user base. It is up to the site owner to determine if a site requires a more robust cookie consent banner."[43]

95.    For OTT website owners seeking more robust cookie consent banners, Vimeo offers the option to integrate "with a third-party solution to ensure legal compliance."[44]

96.    Similarly, "[a]s the operator of [its] streaming service, [OTT website owners, like GazeboTV,] must provide [their] users with a transparent notice of how [they] handle[] their personal information, commonly known as a 'privacy policy.'"[45]

97.    Vimeo provides OTT website owners with a "template that already includes the most common points of collection and uses of data for OTT streaming services." Vimeo makes clear, however, that it "makes no representation about the sufficiency or legality of the templated

---

[41] *Id.*
[42] *Id.*
[43] *Setting up my Vimeo OTT site's cookie consent banner*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426990708241-Setting-up-your-Vimeo-OTT-site-s-cookie-consent-banner    (last visited Dec. 17, 2025).
[44] *Id.*
[45] *Creating a Privacy Policy for your Vimeo OTT* site, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426965711665-Creating-a-Privacy-Policy-for-your-Vimeo-OTT-site    (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

privacy policy" and that OTT website owners "should change the default languages depending on [their] uses of data, additional collection points, and the laws to which [their] organization[s] may be subject."[46]

98.     GazeboTV bore responsibility for notifying Subscribers and obtaining consent, but did not do so as required by the VPPA and applicable federal and state laws.

### III.     The Website and the Tracking Tools

99.     On the Website, Defendants utilized Tracking Tools, including those created by Facebook, Google, and Vimeo (collectively, the "Tracking Entities"), to intercept and disclose Subscribers' Sensitive Information without seeking or obtaining Subscribers' consent.

### A. The Facebook Pixel

100.     Facebook offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

101.     The Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[47]

102.     As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[48]

103.     Here, as discussed in Section II(B), Defendants took steps to add the Pixel to the Website via the Vimeo platform.

104.     The Pixel is employed by GazeboTV to gather, collect, and then share user information with Facebook.[49] Receiving this information enables Facebook and the web

---

[46] *Id.*

[47] *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 17, 2025).

[48] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 17, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[49] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[50] The disclosure of Subscribers' Sensitive Information benefits GazeboTV by improving the effectiveness of advertising targeted at GazeboTV Subscribers. Studies have shown that personalization in digital marketing through targeted and dynamic advertising can boost revenue by 15%.[51]

105.    These personal profiles are used by advertisers to target ads directly at users, customizing the advertisement based off their personal details. The profiles are constructed by combining data from across the internet. The more websites that implement the Pixel, the more information that Meta has to build these profiles.

106.    The profiles contain personal information about the user, such as name, location, age, marital status, education, employment, and family members, and the user's interests, determined by tracking the user's browsing and viewing history.

107.    Website owners and operators can choose to use the Pixel to share both user activity (including video watching activity) and user identity with Facebook. Here, the Website shares both.

108.    The harvested data can improve advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[52]

109.    The Sensitive Information GazeboTV procures Meta to harvest from GazeboTV's Website Subscribers through the Pixel provides similar, if not more, data, including the titles of videos, whether through search terms, webpage URLs, parameters, or metadata, in addition to their Facebook profile data.

---

[50] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Dec. 17, 2025).

[51] Wilson Lau, *What is Targeted Advertising?*, ADROLL BLOG (June 30, 2024), https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Benefits%20of%20Targeted%20Advertising,-1.%20Deliver%20a%20higher (last visited Dec. 17, 2025).

[52] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

110.    The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, as well as whether or not any of the data within the Pixel transmission should be "hashed" (a form of encryption).

### 1. Defendants Implemented the Facebook Pixel on the Website

111.    To activate and use a Facebook Pixel, a website owner must first sign up for a Facebook account; adding the Pixel to the owner's "business portfolio" provides the most utility for using the Pixel.[53]   For instance, business portfolios can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Pages, Instagram accounts, ad accounts, and catalogs from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) post or analyze data analytics collected from Facebook pages or Instagram accounts, (v) run ads businesses across Facebook and Instagram, and (vi) create and manage shops across Facebook and Instagram.[54]

112.    To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during its creation and setup.[55]

113.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[56] and must connect the Pixel to a Facebook Ad account.[57]

---

[53] *How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited Dec. 17, 2025).
[54] *About business portfolios*, FACEBOOK, https://www.facebook.com/business/help/486932075688253 (last visited Dec. 17, 2025).
[55] *Id.*; *see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE (Feb. 4, 2022) https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited Dec. 17, 2025).
[56] *Add people to your Meta Pixel in Meta Business Suite or Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited Dec. 17, 2025).
[57] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

114.    To add the Pixel to its OTT website, the website operator must follow the instructions provided by Vimeo discussed, *supra*, in Section II(B).

115.    After completing these steps, a website operator can begin capturing and sharing information through the Pixel.

116.    A Pixel cannot be placed on a website by a third party. It must be placed directly by or on behalf of the site owner. GazeboTV placed the Pixel on the Website.

### 2. The Pixel as a Tracking Tool

117.    Once the Pixel is set and activated, it begins collecting and sharing user activity data as instructed by the website owner.

118.    When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the datr cookie, and the fr cookie, all of which allow Facebook to link video watching behavior it receives to the Facebook user watching the video, are automatically created and stored on the user's device. [58]

119.    The c_user cookie contains a user's non-encrypted Facebook User ID number ("UID") [59] and has a life span of 365 days.

120.    The datr cookie contains "a unique identifier for [a user's] browser . . . [and] has a lifespan of two years." [60]

121.    The fr cookie contains an encrypted Facebook user ID and browser ID, and has a lifetime of 90 days on a user's device. [61]

---

[58] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Dec. 17, 2025).

[59] *Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Mar. 26, 2025); *Common cookies and uses*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?annotations[0]=explanation%2F1_commo n_cookies_and_uses (last visited Dec. 17, 2025).

[60] *Security, site and product integrity*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=sub page-1.2 (last visited Dec. 17, 2025).

[61] *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Mar. 26, 2025); *Advertising, recommendations, insights and measurement*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Dec. 17, 2025).

122.    For Subscribers who also maintain Facebook accounts, their PII is shared with Facebook. The Pixel automatically bundles that PII with web-watching history when a Subscriber visits a page containing an active Pixel, including the home page.

123.    Recipients of the Pixel's transmissions receive the data in a clear and understandable form. Data that appears complex, including long URLs, is "parsed," or translated into an easier to read format, making the information legible.

124.    For example, an embedded URL in a Pixel HTTP Request may look like an indecipherable code, as depicted below:



*Figure 1 - A Sample Pixel Request URL*

125.    However, these URLs are designed to be "parsed" into easy-to-digest pieces of information, as depicted below:



*Figure 2 - Parsed URL Information from A Sample Pixel Request*

126.    Similarly, the cookies attached to the Pixel's transmissions appear as a dense, though less extensive, wall of text, as depicted below:



*Figure 3- Cookie Data from A Sample Pixel Request (c_user redacted)*

127.    However, like the URL data, the cookie data is easily parsed into a more digestible format, as depicted below:

*Figure 4 - Parsed Cookie Data from A Sample Pixel Request (c_user redacted)*

128.    The c_user cookie can be used by anyone who receives the Pixel transmission to easily identify a Facebook user.

129.    A c_user cookie contains a series of numbers (the User ID or "UID") used to identify a specific profile, as depicted below:



*Figure 5 - Sample UID number of test account created by Plaintiff's counsel to investigate the Pixel, captured by a Pixel event*

130.    The information contained within the c_user cookie is considered PII. It contains "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[62] Because the UID can simply and easily be appended to "www.facebook.com/" to navigate to the relevant user's profile, it requires no special skill or expertise to identify the user associated with the UID, and courts have regularly upheld its status as PII.[63]

131.    Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile.

132.    The UID transmitted by the Pixel enables any individual of ordinary skill and technical proficiency to identify a Facebook user by appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, available through any internet browser, directs the browser to the profile page and to the information contained in or associated with that profile for the user linked to the UID.  Using the UID from *Figure 5*, appending it to the Facebook URL in a standard internet browser (here,

---

[62] *In re Nickelodeon Consumer Privacy Litigation,* 827 F.3d 262, 290 (3d Cir. 2016).
[63] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n*, 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).

www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below (next page):



*Figure 6 - Appending UID of a user to "facebook.com/" results in the user being redirected to the user's profile*

133.    Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language, and country – are "always public."[64] No privacy setting on Facebook would allow Plaintiff, or any user, to hide this basic information. By compelling a visitor's browser to disclose the c_user cookie alongside event data for media content, GazeboTV knowingly discloses information sufficiently permitting an ordinary person to identify an individual.

---

[64] *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

1

### 3. The Pixel Shares Consumers' PII

2       134.     The Pixel tracks user-activity on web pages by monitoring events,[65] which when

3   triggered, instantly causes the Pixel to automatically send data from users' browsers – here,

4   Subscribers' PII – directly to Facebook.[66] Examples of events utilized by websites include: (i)

5   the Pixel triggering the moment a user loads a page with the Pixel installed (the "PageView

6   event") [67]; (ii) the Pixel triggering the moment pre-designated buttons, like the "Watch" button,

7   are clicked (the "SubscribedButtonClick" event)[68]; and (iii) the Pixel triggering the moment a

8   user clicks on a checkout button (the "InitiateCheckout" event, collectively with PageView event

9   and SubscribedButtonClick event, the "Pixel Events").[69] The Website utilizes all three Pixel

10  Events.[70]

11      135.     When a Pixel Event is triggered, a "HTTP Request" is sent to Facebook (through

12  Facebook's URL www.facebook.com/tr/).[71] This confirms that the Pixel Events sent data to

13  Facebook.

14      136.     The HTTP Request includes a Request URL and embedded cookies such as the

15  c_user cookie. It may also include information in its Payload,[72] such as metadata tags.

16

17  _____

18  [65]         *About         Meta         Pixel*,         FACEBOOK,
    https://www.facebook.com/business/help/742478679120153?id=1205376682832142         (last
19  visited Dec. 17, 2025).
    [66] *See generally id.*
20  [67]     *Specifications     for     Meta     Pixel     standard     events*,     FACEBOOK,
    https://www.facebook.com/business/help/402791146561655?id=1205376682832142         (last
21  visited Dec. 17, 2025).
    [68]     *Reference:     standard     events*, FACEBOOK, https://developers.facebook.com/docs/meta-
22  pixel/reference/ (last visited Dec. 17, 2025).
    [69] *Id.*
23  [70] The presence of Pixel events can be confirmed by using the publicly available and free Meta
    Pixel     Helper     tool.     *See     About     the     Meta     Pixel     Helper*,     FACEBOOK,
24  https://www.facebook.com/business/help/198406697184603?id=1205376682832142         (last
    visited  Dec. 17, 2025).
25  [71] *How We Built a Meta Pixel Inspector*, THE MARKUP (Apr. 28, 2022 8:00 AM),
    https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector     (last
26  visited Dec. 17, 2025).
27  [72] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally
    through a POST or PUT request, where the HTTP Request has a distinct message body. Payloads
28

137.    A Request URL, in addition to a domain name and path, contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:





*Figure 7 – Mozilla's diagram of a URL, including parameters[73]*

138.    Defendants use the Pixel as a Tracking Tool that allows Facebook to intercept Subscribers' non-anonymized PII. Defendants do not disclose these data-sharing practices or obtain permission from Subscribers to disclose their PII to Facebook.

139.    Defendants disclose non-anonymized PII and web watching history containing video titles with Facebook. Defendants' disclosures include unique identifiers (the UID) that correspond to specific Facebook users. The recipient finds the UID within a single data transmission that an ordinary person can readily read once the Website's Pixel packages and delivers the PII.

140.    Defendants monetized the Website's Subscribers by gathering Subscribers' PII and disclosing that valuable information to Facebook in a format which allows it to make a direct connection between the identity of a Subscriber and that Subscriber's PII, without the consent of its Subscribers and to the detriment of Subscribers' legally protected privacy rights.

141.    Meta independently benefits from the data collected through the Pixel by using Subscribers' PII to sell targeted advertising services. Through the use of Subscribers' PII, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

---

typically transmit form data, image data, and programming data. *See Request Payload Variation,* SITESPECT, https://doc.sitespect.com/knowledge/request-payload-trigger (last visited Dec. 17, 2025).

[73]    *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 17, 2025).

142.    Defendants had and continue to have the option to design the Website so that webpage URLs exclude video titles. Defendants also had and continue to have discretion over whether to include additional information in Website URLs, including for website interaction and search engine optimization.[74] Here, GazeboTV chose to expose Subscribers' video information and thereby enable the tracking and disclosure of Subscribers' PII.

143.    Defendants had the ability to implement the Pixel in a manner that shielded Subscribers' PII. GazeboTV instead transmitted Subscribers' unencrypted PII.[75]

144.    These factual allegations are corroborated by publicly available evidence. For example, a hypothetical Subscriber visits the Website and clicks on a pre-recorded video, such as "Wind at My Back: Behind The Scenes,"[76] and subsequently watches the video.

145.    Loading a webpage that contains video content triggers a Pixel Event known as the PageView event, which records Subscriber activity. When a Subscriber watches the video, the SubscribedButtonClick event triggers and transmits additional data to Facebook about the video viewed. When a Subscriber initiates a purchase, the InitiateCheckout event triggers.  See *Figures 8* through *11*, below.

146.    Sensitive data sent to Facebook through the triggered Pixel Event are included within the parameters of the Request URL, within the Request Header,[77] or as a Payload within the request. The specific Pixel Events implemented by GazeboTV send Subscribers' PII through

---

[74] *See* Chima Mmeje, *Domains,* MOZ (Nov. 11, 2024), https://moz.com/learn/seo/domain (last visited Dec. 17, 2025).

[75] *See Advanced Matching*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (last visited Dec. 17, 2025).

[76] *Wind at My Back: Behind The Scenes*, GAZEBOTV, https://www.gazebotv.com/wind-at-my-back-behind-the-scenes (last visited Dec. 17, 2025).

[77] Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize its response to the request or supply authentication credentials to the server or otherwise provide more information about the client sending the request. *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

the Request URL parameters,[78] HTTP Headers,[79] and for SubscribedButtonClick events, through metadata.

147.    Defendants share with Facebook the specific streaming content requested by Subscribers through Request URL parameters. Defendants also share Subscribers' PII in the form of an unencrypted and unique UID contained in the c_user cookie within the HTTP Request Header; that UID permits identification of a user's Facebook profile, as described in Section III(A)(2). This is portrayed in *Figures 8* through *11*, below.



*Figure 8 - Sample video webpage on the Website*

---

[78] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 17, 2025).

[79] An "HTTP Header" is a field of an HTTP request or response that passes additional context and metadata about the request or response. *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited Dec. 17, 2025).



*Figure 9 - Video Title and UID included in URL parameters disclosed to Facebook through PageView Pixel Event on the Website*

*Figure 10 – Video Title included in URL parameters disclosed to Facebook through SubscribedButtonClick Pixel Event on the Website*

CLASS ACTION COMPLAINT



*Figure 11 - Video Title and UID included in URL parameters disclosed to Facebook through InitiateCheckout Pixel Event on the Website*

148.    As shown in *Figures 9* through *11*, the triggered Pixel Events transmitted Subscribers' PII to Facebook through Request URL parameters, the Request Header, and metadata contained in the request Payload.

149.    Defendants also transmitted Subscribers' PII in the form of an unencrypted and unique UID contained in the c_user cookie within the HTTP Request Header, as depicted above.

### *4. Pixel Shares Subscribers' Search Terms*

150.    In addition to capturing and sharing Subscribers' video watching history in violation of the VPPA, and regardless of how the Subscriber reached the video page, the Pixel intercepted and shared search terms entered by Plaintiff.

151.    The search terms include the title or description of the video watched or purchased by the Subscriber.

152.    After a Subscriber submits search terms, the Website returns search results and causes the browser to load a search results page, including results for a specific video. Loading that page automatically triggers a PageView Pixel event, which immediately collects and transmits the Subscriber's PII and web browsing activity to Facebook.

153.    For example, a search for "Wind behind my back" on the Website appear in *Figures 12* and *13*, below.



*Figure 12 – Sample search for "Wind behind my back" on the Website*

CLASS ACTION COMPLAINT

*Figure 13 – Search terms included and disclosed to Facebook through PageView Event*

154.    Such search terms, while independently confidential, also capture and share searches associated with Subscribers' video watching history, resulting in violations of the VPPA.

155.    The Pixel operates on the Website as implemented by Defendants.

156.    When a Subscriber or visitor submits search terms through the Website's search bar, Facebook intercepts and monetizes those terms.

157.    Plaintiff did not know that the Pixel intercepted confidential communications with the Website.

158.    Plaintiff reasonably believed communications with the Website were confidential.

CLASS ACTION COMPLAINT

159.   Defendants provided no notice or warning regarding interception or decoding of communications and gave Plaintiff no opportunity to consent to interception of search terms.

### 5. Defendants Were Told The Pixel Discloses Subscribers' Data; They Knew Precisely What the Pixel Would Collect and Share

160.   When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy) including PII.[80]

161.   To make use of the Pixel, Defendants agreed to Facebook's Business Tool Terms (the "Business Terms").

162.   The Business Terms informs website owners using Facebook's tracking tools that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information ("Event Data") and contact information ("Contact Information").[81]

163.   The Business Terms are transparent that Meta will use the Event Data and Contact Information will be processed "solely to match the Contact Information against user IDs ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[82]

164.   Facebook directs parties implementing the Pixel – here, GazeboTV – to encrypt request information[83] *before* data can be shared.[84]

---

[80] *See Get Started*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/get-started (last visited Dec. 17, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[81]   *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited  Dec. 17, 2025).

[82] *Id.*

[83] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. GazeboTV has specifically chosen the Pixel method which makes users' information visible. *See id.*

[84] *Id.*

CLASS ACTION COMPLAINT

165.    Facebook provides Pixel users, including GazeboTV, with guidance on responsible data handling and explains how data is acquired, used, stored, and shared with Facebook.

166.    The Business Terms require Pixel users to represent and warrant that they will not share data that includes "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[85]

167.    Facebook informs Pixel users of their obligation to disclose website data sharing to subscribers and instructs website owners to obtain required rights, permissions, or consents before sharing information with any third party.[86]

168.    GazeboTV entered a business relationship with Facebook and received notice of privacy risks associated with Pixel use. GazeboTV disregarded Facebook's guidance on safe data handling and failed to inform Subscribers that the Website disclosed information affecting VPPA protected PII.

**B. The Google Tracking Tools**

169.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

### 1. Google Ads

170.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[87]

171.    The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually

---

[85] *Id.*

[86] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Dec. 17, 2025).

[87] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Dec. 17, 2025).

related to their business or target audience, intended to trigger their ads to appear within the user's search results;[88] (iii) Google then allows advertisers to bid on those various keywords;[89] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

172.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[90] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

173.    AdSense for content or AdSense for search are methods by which AdSense functions.[91] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

174.    Google Ads intercepted Plaintiff's search terms, as depicted, below, using the sample search "Wind behind my back."

---

[88] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Dec. 17, 2025).
[89] *Id.*
[90] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Dec. 17, 2025).
[91] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Dec. 17, 2025).

CLASS ACTION COMPLAINT

*Figure 14 – Test search made on the Website resulted in sharing Search Terms with Google Page Ads*

175.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

176.    Through Google AdSense, Google aggregates search data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users search for and what they are interested in. That insight supports service improvements, product development, and revenue growth.

177.    Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[92] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[93] For example, when a user clicks on a particular search result and spends more time on that page, Google treats that interaction as a signal of relevance to the search query. By aggregating such data across users,

---

[92] Elle Poole Sidell, *What Does Google Do With Your Data?*, Avast (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Dec. 17, 2025).
[93] *Id.*

CLASS ACTION COMPLAINT

Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[94]

178.    Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of search data.

### 2. Google Analytics

179.    Like the Facebook Pixel, Google Analytics ("GA") collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[95]

180.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[96] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[97]

181.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendants.

---

[94] *Id.*

[95] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Dec. 17, 2025).

[96]    *About    the    Google    tag*,    GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Dec. 17, 2025).

[97] *Id.*

CLASS ACTION COMPLAINT

182.    Here, Defendants added GA to the Website. That implementation caused Plaintiff's search terms to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:



*Figure 15 – Test search made on the Website resulted in sharing search terms with Google Analytics*

183.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendants to monetize the collected data through targeted advertising.

### IV.    The Website Lacks Informed, Written Consent Pursuant to the VPPA

184.    The Website does not seek or obtain permission from Subscribers, including Plaintiff and the Class, to share Subscribers' PII or video-watching history with third parties, including Facebook.

185.    The GazeboTV sign-up process does not seek or obtain informed, written consent for any such disclosures.

186.    To the extent any data-sharing language exists on the Website, it is not (i) presented to Subscribers in a clear or transparent manner; (ii) required to be viewed during the

sign-up process; (iii) offered through a checkbox, e-signature field, or other affirmative consent mechanism; or (iv) framed in terms that warn Subscribers that VPPA-protected information will be disclosed to third parties.

## V.   Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's Search Terms

187.   Plaintiff was unaware that the Pixel and other Tracking Tools intercepted his confidential communications with the Website. Absent Class and Subclass Members were equally unaware of those interceptions.

188.   Plaintiff reasonably believed that his communications with the Website were made in confidence. Absent Class and Subclass Members held the same expectation regarding their own communications.

189.   Defendants provided no notice identifying who intercepted or decoded the contents of those communications. Plaintiff therefore had no opportunity to provide consent to the interception of his search terms.

190.   Meta and Google warn website operators that use of their tracking tools requires notice and valid consent before collecting protected consumer data or allowing third-party interception. Defendants agreed to those terms to deploy the Tracking Tools.

191.   Despite those requirements, Defendants provided Plaintiff with no notice that the Tracking Tools operated on the Website.

192.   Plaintiff therefore did not and could not consent to the collection or sharing of his data when visiting the Website, running searches, or requesting videos.

## VI.   Plaintiff Has a Privacy Right in their Search Terms

193.   Senator Leahy anticipated that technological developments would allow companies to build detailed profiles of consumers based on their habits.

194.   Communications between consumers and companies often appear private, but the contents of those communications are frequently shared.

195.   Here, Defendants share consumer information, including search terms, with the Tracking Entities.

196.    Search terms are private. This is especially true when searches are communicated in confidence or reasonably understood to be private. Searches may include sensitive or personal information, which heightens the need for confidentiality.

197.    As described in Section I(A), descriptions and summaries of requested prerecorded audiovisual materials constitute private information protected under federal law.

198.    Subscribers use search terms on the Website to locate video materials. When paired with descriptions or summaries of prerecorded videos, those search terms reveal more than basic browsing activity.

199.    Courts recognize a reasonable expectation of privacy in URLs that disclose unique search terms or identify specific content viewed within a website.

200.    As shown in Section IV, Defendants disclose such information through detailed URLs shared with third parties, including the Tracking Entities..

## INJUNCTIVE RELIEF OF DEFENDANTS' ONGOING VPPA AND WIRETAP VIOLATIONS

201.    An actual and immediate controversy exists between Plaintiff and the putative Classes, on the one hand, and Defendants, on the other. The parties have opposing interests that are direct and substantial. Defendants have violated, and continue to violate, Plaintiff's and Class Members' rights under the VPPA and the Wiretap Act.

202.    Plaintiff is likely to succeed on the merits of these claims and is entitled to declaratory and injunctive relief.

203.    Plaintiff lacks an adequate remedy at law to stop Defendants' ongoing violations of the VPPA and the Wiretap Act. Absent injunctive relief, Defendants will continue to infringe the privacy rights of Plaintiff and Class Members and cause irreparable harm through continued disclosure of Sensitive Information. Injunctive relief serves the public interest.

204.    GazeboTV disregarded its obligations under the VPPA and the Wiretap Act by deploying the Tracking Tools on the Website and enabling third parties to access Subscribers' Sensitive Information.

205. Defendants provided no notice of the Tracking Tools and no disclosure regarding the scope of information shared. Defendants also failed to seek or obtain consent for the use of the Tracking Tools.

206. Ongoing violations present a continuing threat of injury that requires temporary, preliminary, and permanent injunctive relief.

## TOLLING

207. Defendants' conduct tolled the statutes of limitations applicable to Plaintiff's and the Classes' claims, based on delayed discovery.

208. Plaintiff and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to third parties when they used the Website. Reasonable diligence would not have revealed Defendants' conduct.

209. Defendants embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with third parties.

210. Defendants possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendants failed to disclose that interacting with the Website would result in disclosure of PII to third parties.

211. The technical nature of the Tracking Tools prevented discovery of the full scope of Defendants' conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

212. Plaintiff and Class Members first learned of Defendants' conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

213. Plaintiff brings this action individually and on behalf of the following Classes:

**Nationwide Class**: All persons in the United States with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

**California Subclass**: All persons in California with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

214.    Specifically excluded from the Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

215.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

216.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

217.    Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendants' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

218.    Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, the Website to watch videos, and had his Sensitive Information collected and disclosed by Defendants.

219.    Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests antagonistic to, nor in conflict with, the Classes. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

220.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek

redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

221.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a.    Whether Defendants collected Plaintiff's and the Class's Sensitive Information;

b.    Whether Defendants unlawfully disclosed and continue to disclose the Sensitive Information of Subscribers of the Website in violation of the VPPA, the Federal Wiretap Act, and CIPA;

c.    Whether Defendants' disclosures were committed knowingly; and

d.    Whether Defendants disclosed Plaintiff's and the Classes' Sensitive Information without consent.

222.    Information concerning Defendants' Website's data sharing practices and subscription members is available from Defendants' or third-party records.

223.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

224.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

225.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

226.    Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

227.    Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

228.    Plaintiff brings this count on behalf of himself and all members of the Class.

229.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

230.    The VPPA also prohibits direct marketers from using disclosed titles and descriptions of videos to market goods and services directly to consumers. 18 U.S.C. § 2710(b)(2)(D)(ii).

231.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

232.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

233.    Defendants violated this statute by knowingly disclosing Plaintiff's and other Class Members' personally identifiable information to Facebook.

234.    Defendants, through the Website, engage in the business of selling and/or delivering video content to Subscribers, including Plaintiff and the other Class Members, and other users. The Website sells and/or delivers videos to Subscribers, including Plaintiff and the other Class Members, by transmitting the content of the videos from its servers to Plaintiff's and Class Members' devices.

235.    Defendants are each a "video tape service provider" because they curate, host, provide access to, sell, and deliver thousands of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

236.    Defendants solicit individuals to pay to and/or subscribe to the Website.

237.    Plaintiff and members of the Class are "consumers" because they subscribe to (by creating an account and/or signing up for newsletters with their email address) and/or made purchases on Defendants' Website. 18 U.S.C. § 2710(a)(1).

238.    Plaintiff and members of the Class viewed videos on the Website.

239.    Defendants disclosed Plaintiff's and Class Members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiff's web browser to transmit Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's and Class Members' event data, including the title of the videos they viewed, to Facebook.

240.    Defendants knowingly disclosed Plaintiff's and Class Members' PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook, or any third-party are required. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user. *See* Section III(A)(2) (process to identify individual using UID).

241.    Plaintiff and members of the Class did not provide Defendants with any form of consent, either written or otherwise, to disclose their PII to Facebook. Defendants failed to obtain "informed, written consent" from Subscribers – including Plaintiff and members of the Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

242.    Defendants' disclosures of Plaintiff's and Class Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants'

disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiff's and Class Members' PII was used for improving marketing effectiveness.

243.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

244.    On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with the VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

245.    Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint.

246.    Codified under 18 U.S.C. § 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

247.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

248.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

249.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

250.    The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

251.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

252.    Defendants are each a person for the purposes of the Wiretap Act.

253.    Plaintiff is a person for the purposes of the Wiretap Act.

254.    The Pixel, other Tracking Tools, Defendants' servers, and Plaintiff's and Class Members' PCs and browsers constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

255.    The confidential communications Plaintiff had with the Website, in the form of their Sensitive Information, were intercepted by the tracking entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

256.    Plaintiff had a reasonable expectation of privacy in his electronic communications with the Website, including search terms submitted to the Website and browsing activity. Those communications included titles, descriptions, and summaries of the films and videos Plaintiff watched, searched for, requested, or accessed by subscription, along with identifying information. The nature of that content gave rise to a reasonable expectation of privacy, including privacy interests protected by the VPPA.

257.    Plaintiff reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Website.

258.    Within the relevant time period, the electronic communications between Plaintiff and the Website were intercepted by the Tracking Tools contemporaneously with their

transmission, without Plaintiff's consent, and through Defendants' knowing and intentional deployment of those tools.

259.    Interception of Plaintiff's confidential communications with the Website occurs whenever a user uses the search bar within the Website, clicks on any button to access video content, and when navigating various webpages of the Website, including those containing videos.

260.    At all times relevant to this Complaint, Defendants' conduct was knowing, willful, and intentional, as Defendants are sophisticated parties with full knowledge regarding the functionality of the Tracking Tools including that allowing the Tracking Tools to be implemented on the Website would cause the private communications of their Subscribers to be shared with the Tracking Entities.

261.    Plaintiff was never asked to consent to the interception, recording, or disclosure of his confidential electronic communications with the Website. Defendants did not provide notice that any third party would intercept or receive those communications.

262.    Defendants did not seek Plaintiff's consent in any form. Plaintiff therefore did not and could not authorize the interception, recording, or disclosure of his electronic communications with the Website.

263.    The absence of consent resulted directly from Defendants' deployment of the Tracking Tools without disclosure. Plaintiff's communications were intercepted contemporaneously with transmission and without authorization.

264.    As detailed above, the Tracking Entities' unauthorized interception, disclosure and use of Plaintiff's confidential communications were only possible through Defendants' knowing, willful, or intentional placement of the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

265.    Plaintiff has been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such Plaintiff is entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by the tracking entities as a

result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

**COUNT III**
**INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Nationwide Class)**

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

267.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against GazeboTV.

268.    GazeboTV intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations including Sensitive Information to which it was not an authorized party.

269.    GazeboTV's participation in the Tracking Entities' tracking and interception of Sensitive Information was not authorized by Plaintiff or Class Members.

270.    GazeboTV's enabling of the Tracking Entities' intentional intrusion into Plaintiff's and Class Members' internet communications including Sensitive Information was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

271.    Secret monitoring of Sensitive Information is highly offensive behavior.

272.    Wiretapping and the surreptitious recording of communications including PII is highly offensive behavior.

273.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person is handling PII. Plaintiff and Class Members have been damaged by GazeboTV's facilitation of Tracking Entities' intrusion upon their seclusion and are entitled to reasonable

compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

274.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

275.    Plaintiff brings this count on behalf of himself and all members of the California Subclass.

276.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section.  Cal. Penal Code § 631(a).

277.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).  In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication.  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

278.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

279.    Within the relevant time period, Plaintiff and members of the California Subclass communicated browsing history to Defendants, with the expectation of receiving video content provided by Defendants.

280.    Within the relevant time period, Defendants, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

281.    The information collected by the Tracking Tools was not for the sole benefit of Defendants.

282.    Within the relevant time period, Defendants aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to intercept, collect, and disclose electronic communications in violation of CIPA § 631.

283.    Plaintiff and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

284.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**COUNT V**
**VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638**
**(On Behalf of Plaintiff and the California Subclass)**

285.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

286.    Plaintiff brings this count on behalf of himself and all members of the California Subclass.

287.    Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51.

288.    "Trap and trace device" means "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of the communication." *Id.* § 638.50(c).

289.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

290.    Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . .[98]

291.    "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[99]

292.    Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications.'" *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

293.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).  No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendants.

294.    Defendants use pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture

---

[98] Cal. Penal Code § 638.51.
[99] *Id.* § 638.50(b).

the phone number, email, routing, addressing and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

295.    Defendants were not authorized by any court order to use pen register and trap and trace devices to track Plaintiff's and California Subclass Members' Sensitive Information.

296.    Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

297.    As a direct and proximate result of Defendants' conduct, Plaintiff's and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT VI
### Violations of California's Consumer Legal Remedies Act
### Cal. Civ. Code § 1770 et seq. ("CLRA")
### (On Behalf of Plaintiff and the California Subclass)

298.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

299.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

300.    Defendants are persons under the CLRA.

301.    Plaintiff is a consumer of Defendants' services under the CLRA, as Plaintiff subscribed to Defendants' video production service.

302.    Defendants undertook deceptive acts or practices, in violation of the CLRA, by failing to disclose the presence of the tracking tools on the Website. Defendants violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

303. By this failure to disclose, Defendants violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

304. By this failure to disclose, Defendants violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

305. Defendant's failure to disclose was material to Website visitors such as the Plaintiff, as they may have chosen to use a different website that did not have tracking tools, that disclosed the presence of tracking tools and the ability to disable them, or that asked for their consent before implementing tracking tools.

306. As a direct and proximate result of Defendants' conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT VII
### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")
### (On Behalf of Plaintiff and the California Subclass)

307. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

308. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

309. By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendants have violated the unlawful prong of the UCL.

310. By disclosing the personal identifying information of consumers in violation of the VPPA, Defendants have violated the unlawful prong of the UCL.

311. By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendants have violated the unlawful prong of the UCL.

312.    By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendants have violated the unlawful prong of the UCL.

313.    By failing to disclose the presence of the tracking tools on the Website, by disclosing the personal identifying information of visitors without their knowledge or consent, by disclosing visitors' information to Facebook to build personal profiles of visitors without their knowledge or consent and by failing to disclose that they were wiretapping visitors' conversation with the Website, Defendants violated the unfair prong of the UCL.

314.    Plaintiff has standing to bring claims against Defendants for UCL violations, because they had their information tracked and recorded without their consent, and had their data used to build personal profiles for advertising purposes without their consent.

315.    Plaintiff would have considered it important to the decision to subscribe to Defendants' Website to know that his data was being tracked and recorded without their consent. Indeed, any reasonable Facebook user would have wanted to know that information.

316.    Because of Defendants' UCL violations described above, Plaintiff suffered injury by losing control of their personal data and having their personal information tracked and recorded without his consent.

317.    As a direct and proximate result of Defendants' conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

(b)    For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted

herein;

(d)     Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendants to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Subscribers;

(e) An award of statutory damages or penalties to the extent available;

(f)     For Defendants to pay $2,500.00 to Plaintiff and members of the Classes, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(g)     For damages in amounts to be determined by the Court and/or jury;

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 2, 2026          **BRYSON HARRIS SUCIU & DeMAY PLLC**

By: _/s/ Trenton R. Kashima_
Trenton R. Kashima (SBN 291405)
19800 MacArthur Blvd., STE 270
Irving, CA 92612
Tel: 619-810-7047
tkashima@brysonpllc.com

*Counsel for Plaintiffs*

Mark S. Reich*
Christopher V. DeVivo*
Michael N. Pollack*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com
Email: mpollack@zlk.com

*Counsel for Plaintiff*
*pro hac vice* forthcoming

CLASS ACTION COMPLAINT